**C. L. COOKE & SON, Appellant,**

v.

**TRINITY UNIVERSAL INSURANCE COMPANY, Appellee.**

No. 11790.

Court of Civil Appeals of Texas, Austin.

Feb. 3, 1971.

Rehearing Denied Feb. 24, 1971.

Second Rehearing Denied March 17, 1971.

Quinn & Price, Nelson Quinn, Abilene, for appellant.

Thompson, Coe, Cousins, Irons & Porter, R. B. Cousins, Dallas, for appellee.

O'QUINN, Justice.

C. L. Cooke and Son, a partnership, sought recovery against Trinity Universal Insurance Company of Dallas upon a "Texas All Risk Builder's Risk Form" insurance policy which contained the following provision as to coverage:

"Covering any and all materials, permanent fixtures and supplies (including labor costs and other incidental construction expenses) of any nature whatsoever, the property of the Assured or the property of others in the custody or control of the Assured, to be used in the fabrication and/or erection and/or installation and/or repairing and/or renovating of buildings."

The hazards insured were "all risk or direct physical loss or damage from any external cause * * *"

The building involved was an "Atlas" missile base, or silo, belonging to the United States Government, no longer used for national defense and designated for dismantling of fixtures and equipment preparatory to sale by the government of the land and silo structure. In the course of the work, being performed by Cooke and Son as sub-contractors under Progress Petroleum, Inc., a fire erupted in one missile silo, destroying a large quantity of goods and equipment.

After Cooke and Son rested its case, Trinity moved for an instructed verdict. The trial court withdrew the case from the jury and rendered judgment that Cooke and Son recover nothing. In taking this action, the trial court advised the jury that the court had determined that the loss was not covered by the contract of insurance.

The main question on appeal is whether the work being performed by Cooke and

Son in the silo amounted to renovation of the structure in such manner as to place the operation under coverage by the insurance policy. No contention is made that the work performed substantially constituted fabrication, erection, installation or repair of the building.

Work to be performed under the contract between Cooke and Son and Progress Petroleum, Inc., is described in paragraph No. 1 of their contract made March 18, 1966:

"1.) *Work to be Performed*: Contractor agrees to dismantle and remove from the silos and surrounding areas at each of the 12 Atlas 'F' Missile sites heretofore designated, every and all property and equipment, including the property and equipment listed on Pages 1 through Page 65 of IFB 01–6017, except such property which may be specifically excluded herein or by IFB 01–6017. Such property further includes all stainless steel, piping, valves, hoses, cables, tanks, antennas, cooling towers and equipment contained in the silos at the 12 Atlas 'F' Missile sites, with the exception of the crib steel structure, air conditioning vents, fluorescent light fixtures and crew quarter fixtures in the launch control center and the buried tanks outside the concrete silos; however, as to the removal of copper, Contractor shall be committed only to remove at least 90 per cent of the copper contained in the silos of the 12 Atlas 'F' Missile sites, viz., Contractor shall remove all copper contained *in* all piping and in the 1″ and larger conduit, at least 50 per cent of the copper contained in the ¾″ conduit and shall be responsible for removing no copper in smaller conduit.

. As part of the dismantling and removal of the property and equipment, Contractor is to dismantle and remove for the Government, the listed items in IFB 01–6014 designated 'save list items,' and Contractor shall load and secure such property and equipment on board at site, provided Owner has trucks available, or strap such property and equipment to pallets provided by the Government.

Contractor represents and warrants that the property and equipment to be dismantled and removed will be turned over to the Owner, and as to 'save list items' the Government, at the site in as good condition as they were at the time of commencement of work by Contractor at each site."

The contract further provided:

"The Owner may require the Contractor to clean up, close and secure any one or more of the 12 sites pursuant to the Special Conditions of IFB 01–6017. If the Contractor is requested by Owner to clean up, close and secure a site prior to the time he completes his dismantling and removal work at the site he shall receive the sum of $650 per site in addition to the contract price of $21,000 per site. If he is requested to perform the clean up, closing and securing work after he completes his dismantling and removal at a particular site, the Contractor shall receive in addition to the contract price, the sum of $790 per site. Upon request to clean up, close and secure a site, Contractor shall commence and proceed with such work with reasonable diligence and in a good and workmanlike manner as required by Article AQ of the Special Conditions of IFB 01–6017."

By supplemental agreement the parties provided that, in addition to work to be performed under Paragraph 1, Cooke and Son agreed:

" * * * to remove all equipment from the launch platforms after removing the launch platforms from the silos; to remove the work platform assemblies, launch platform guide rails, diesel exhaust pipes, all 3 inch and larger pipes mounted on or attached to the crib structure and the sub-base for the launch platform drive assembly; for which Contractor shall receive an additional Nine Hundred Dollars ($900.00) per site.

* * * * * *

Owner will pay Contractor Five Hundred Twenty Five Dollars ($525.00) for removal of each personnel elevator from the sites."

Horace Cooke, one of the contracting partners, testified that the work performed in the silo, a reinforced concrete structure almost entirely below ground level, did not entail fabrication or installation of a building, but that there was "a little bit of repair work," although the main job was to get the equipment and fixtures out of the silo. Under cross-examination, Cooke was asked, "You didn't renovate a building?" His reply was, "I had to do quite a bit of work on it."

L. J. Onstott, president of Petroleum Progress, Inc., at the time of the contract with Cooke and Son, testified that his company had bought all equipment in the silo, except "saved list" items reserved by the government, but that all equipment and fixtures in the silo were to be removed by Cooke and Son. In this connection, Onstott testified:

"Q And then it was your obligation to then return the missile silo to a condition satisfactory to the Government?

"A All the removal work was subject to the inspection and approval of the Government and to be done within their regulations. Certain security operations were done as far as the closing of the entrance to the site and to secure it so that it couldn't be re-entered without a major undertaking.

"Q Most all of this then was under the supervision of the Government?

"A Yes."

The record does not disclose the extent to which repair or renovation of the silo was performed in connection with dismantling or whether such work constituted a substantial part of the work performed by Cooke and Son. It does not appear in dispute, as between the parties, that the primary function of Cooke and Son was to remove all fixtures and equipment from the silo, clean up the structure and close it, all in a manner satisfactory to the government, so that the land and the empty silo could be put up for sale.

We have been referred to several definitions of the words renovation and renovate.

Webster defines renovate: "To renew, make over, or repair; to restore to freshness, purity, a sound state, newness of appearance, etc.; as, to renovate draperies, or a house * * *" Webster's New International Dictionary of the English Language, Second edition, unabridged (1954). Basically, from Latin, renovate literally means "to make new." Obviously repairs, if extensive enough, may amount to renovation.

From the record it is apparent that the silos, with the adjoining underground rooms in which were housed motors, machinery, electrical controls, hydraulic rams, and other equipment and fixtures used in maneuvering and firing "Ajax" missiles, as well as the rooms affording living quarters for operation crews, were stripped of all equipment and fixtures, even including elevators, and that the structures were reduced to bare walls and floors. The purpose of such dismantling was to effect abandonment of the bases as a part of the national defense system and to convert the structures into underground buildings ready to be adapted to other uses.

In order to convert the structures to other uses, the fixtures and equipment essential to a missile base had to be removed. It was necessary as a final procedure to clean the buildings and to close permanently the overhead doors, previously operated by power, which as then used permitted discharge of the missile. The record establishes that dismantling of fixtures and equipment peculiar to a missile site was essential to put the underground structures in a condition acceptable for uses entirely different from the original use made of the buildings. It is common knowledge that cavernous underground concrete structures,

likened to large limestone caves, may be used for storage and some other purposes to which natural caverns are devoted.

Trinity's position is that Cooke and Son was not fabricating, erecting, installing, repairing, or renovating the building in which the fire occurred and the work there being performed was not therefore covered by the insurance contract. Pursuant to the "Builder's Risk Reporting Endorsement," Cooke and Son reported each missile site job monthly and paid premiums at an agreed rate, based on a value upon completion of $60,000 at each site.

Upon reporting for July, 1966, the month in which the fire occurred in one of the silos, Cooke and Son tendered the monthly premium, which Trinity refused to accept. Cooke and Son pleaded estoppel and testimony was given in support of the plea. The issue is not before us on appeal.

In withdrawing the case from the jury and holding that the work performed by Cooke and Son was not covered by the contract of insurance, the trial court impliedly found that the term "renovation," as used in the contract and applied to the facts of the case, was not ambiguous. Under the facts we find the term "renovation" capable of being understood in either of two or more ways and therefore ambiguous. The question should have been submitted to the jury. We sustain appellant's point that it was error to withdraw the case from the jury because the evidence was sufficient to justify submission to the jury the question whether the work performed constituted renovation.

Trinity brings a counter-point that the single point of error brought by Cooke and Son is so general as to be meaningless and is not in compliance with Tex.Rules Civ.Proc. Rule 418(b). We overrule this counter-point, since we are able from the statement and argument under appellant's point of error to ascertain the grounds for the point. Wilkinson v. Texas Employers'

Insurance Association, 444 S.W.2d 222 (Tex.Civ.App.1969, no writ).

The judgment of the trial court is reversed and the cause is remanded for trial.